# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| BLUETARP FINANCIAL, INC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Docket No. 2:11-cv-290-GZS |
| | ) |
| MATRIX CONSTRUCTION CO. INC., | ) |
| | ) |
| | ) |
| Defendant. | ) |

## ORDER ON MOTION TO DISMISS

Before the Court is Defendant's Motion to Dismiss Plaintiff's Complaint (Docket # 7). As explained herein, the Court GRANTS the Motion.

**I.  LEGAL STANDARD**

Defendant seeks dismissal of this case pursuant to Fed. R. Civ. P. 12(b)(2), (3), and (6). A motion to dismiss under Rule 12(b)(2) seeks dismissal based on lack of personal jurisdiction. The personal jurisdiction of a federal court sitting in diversity is equivalent to that of a state court sitting within the forum. Tice v. Taiwan Shin Yeh Enterprise Co., Ltd., 608 F. Supp. 2d 119, 121 (D. Me. 2009) (citing Nowak v. Tak How Invs., Ltd., 94 F.3d 708, 712 (1st Cir. 1996)). Thus, to establish personal jurisdiction over a defendant, the plaintiff must demonstrate both that Maine's long-arm statute grants jurisdiction and that exercise of jurisdiction under the statute is consistent with the Due Process Clause of the United States Constitution. Id. (citing Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 52 (1st Cir. 2002)). Because Maine's long-arm statute is coextensive with the permissible exercise of personal jurisdiction

under the Constitution, the due process inquiry controls the instant case. See 14 M.R.S.A. § 704-A; Murphy v. Keenan, 667 A.2d 591, 593 (Me. 1995).

Plaintiff has the burden to persuade the Court that it has personal jurisdiction over Defendant. See Mass. Sch. of Law v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998). To assess whether Plaintiff has met its burden, the Court applies the prima facie standard, and accepts Plaintiff's proffered facts construing them in the light most favorable to Plaintiff. See id. Additionally, the Court considers any uncontradicted facts put forward by Defendant. See id. In making this showing, Plaintiff may not rely on unsupported allegations in its factual pleadings, but is obligated to adduce evidence of specific facts.[1] See id.

The filing of a Rule 12(b)(3) motion likewise places the burden on the plaintiff to demonstrate the propriety of venue. See McGinley v. Wahoo Funding, Inc., 2007 WL 1810712, at *1 (D. Me. June 21, 2007) (citing 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1352 at 321-22 (3d ed. 2004)). The procedural analysis applied in determining a challenge of venue follows the procedure for analysis employed in a motion under Rule 12(b)(2).[2] See Salisbury Cove Associates, Inc. v. Indcon Design (1995), Ltd., 211 F. Supp. 2d 184, 187 (D. Me. 2002).

Finally, a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6)[3] tests the "legal sufficiency" of a complaint. Gomes v. Univ. of Maine Sys., 304 F. Supp. 2d 117, 120 (D. Me. 2004). "To survive a motion to dismiss, a complaint must contain sufficient factual

---

[1] To determine the relevant jurisdictional facts, the Court has considered the affidavits and other materials submitted by the parties in addition to the pleadings. Such consideration of materials outside the pleadings in the context of a motion under Fed. R. Civ. P. 12(b)(2) does not require conversion to a motion for summary judgment. See Fed. R. Civ. P. 12(b).

[2] Because of the Court's ruling on the motion to dismiss for lack of personal jurisdiction, the Court need not consider the question of venue.

[3] In the First Circuit, courts view motions to dismiss based on forum selection clauses through the lens of Rule 12(b)(6). See Rivera v. Centro Médico de Turabo, Inc., 575 F.3d 10, 15 (1st Cir. 2009).

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, --- U.S. ----, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (citation and internal punctuation omitted).

Of course, the Court must accept as true all well-pleaded factual allegations in a complaint and draw all reasonable inferences in a plaintiff's favor. See id. at 1949-50; Rivera v. Centro Médico de Turabo, Inc., 575 F.3d 10, 15 (1st Cir. 2009). In distinguishing sufficient from insufficient pleadings, "a context-specific task," the Court must "draw on its judicial experience and common sense." Ashcroft, 129 S.Ct. at 1950.

## II. FACTUAL BACKGROUND

Defendant Matrix Construction Company ("Matrix" or "Defendant") is a South Carolina corporation with a principal place of business in Anderson, South Carolina. Matrix has never had an office in Maine, has never bid on a construction project in Maine, has never worked on a construction project in Maine, and has never purchased construction supplies from suppliers located in Maine.

In 2010, Matrix was retained as the general contractor for construction projects at three schools in South Carolina. In accordance with its role as general contractor, Matrix solicited bids from subcontractors and building materials suppliers. Matrix accepted a bid from Contract Supply LLC ("Contract Supply") to provide wood doors and hollow metal frames for the projects. Contract Supply is a South Carolina company with a principal place of business in Maudin, South Carolina. After Matrix accepted the bid, Contract Supply informed Matrix that it

3

could not enter into an agreement until Matrix completed a commercial credit application. On May 24, 2010, Contract Supply faxed a note to Matrix asking that Matrix complete a commercial credit application. Although Matrix preferred to pay for supplies by check and already had a line of credit with a local bank at a favorable rate, Matrix agreed to complete the application. Matrix's office manager, Cyndi Durham signed the commercial credit application in South Carolina but left the "Requested Credit Line" blank, because, as Matrix alleges, Matrix did not intend to purchase materials using the line of credit provided by Contract Supply. Durham then faxed the completed application back to Contract Supply in South Carolina.

Shortly thereafter, on May 24, 2010, Matrix received a fax from BlueTarp Financial, Inc. ("BlueTarp" or "Plaintiff") thanking Matrix for applying for credit with BlueTarp but informing Matrix that its application could not be processed because Matrix had failed to fill out the "Requested Credit Line" and had failed to have the application signed by a corporate officer. On June 2, 2010, Matrix faxed an updated application to BlueTarp in Portland, Maine. The updated application had been signed by Matrix President H.M. King, Jr. in South Carolina and listed $5,000 in the "Requested Credit Line."[4] The second page of the application contained an Account Agreement (the "Agreement"). BlueTarp approved the application and on June 8, 2010 sent a welcome letter to Matrix advising Matrix of its initial credit limit, providing billing and payment information, and setting forth the terms and conditions of the Agreement, which contained provisions stating that the agreement between the parties "will be governed by the laws of the State of Maine" and that "[i]n the event of default in payment, BlueTarp … may institute suit against you in the courts of the State of Maine, regardless of where you are geographically located or conduct business." (See Docket # 7-18, PageID 131-32.)

---

[4] Matrix asserts that it requested only $5,000 because it did not intend to purchase any building supplies from Contract Supply on credit from BlueTarp.

4

Matrix submitted three purchase orders to Contract Supply dated June 11, 2010, January 14, 2011, and May 5, 2011, respectively. (See Docket # 7-19, PageID 133-35.) These purchase orders totaled more than $167,000. Contract Supply invoiced Matrix directly for the purchase orders Matrix placed with Contract Supply. These invoices spanned from September 2010 to May 2011. (See Docket # 7-20, PageID 136-61.) From September 2010 to March 2011, Matrix paid Contract Supply directly by check.[5] (See Docket # 7-21, PageID 162-173.) Between July 2010 and May 2011, Matrix received a total of twelve billing statements from BlueTarp. Each of these statements contained an Atlanta, Georgia mailing address and instructions to send payment to BlueTarp in Atlanta, Georgia. (See Docket # 7-23, PageID 176-210.) During this eleven month span, correspondence from BlueTarp also indicated that Matrix's credit line was increased first to $10,000 and later to $144,000.[6] Moreover, BlueTarp and Matrix exchanged several additional communications over these eleventh months, a majority of these communications concerned collections.

In June 2011, Matrix learned that Contract Supply had not paid its suppliers for the materials purchased by Matrix. Soon thereafter, Matrix suspended payments to Contract Supply. On June 15, BlueTarp collections manager Theresa Gouzie sent Matrix office manager Cyndi Durham an email demanding payment of $118,201.50 for "purchases outstanding against your BlueTarp Account." (See Docket # 7-24, PageID 211.) On August 31, 2011, Matrix received a letter from Contract Supply demanding payment for building materials orders.

Matrix contends that it never placed purchase orders with Contract Supply through BlueTarp, never made any payments to BlueTarp for the building materials Matrix purchased

---

[5] Matrix asserts that it never placed purchase orders with Contract Supply through BlueTarp nor communicated with BlueTarp regarding these orders.

[6] Matrix asserts that it never requested a credit limit increase and that Matrix never discussed such a credit limit increase with BlueTarp.

from Contract Supply, nor communicated with BlueTarp concerning the purchase orders. Matrix asserts that it made all of its purchase orders from Contract Supply directly and that it paid Contract Supply directly by check. Meanwhile, BlueTarp asserts that between July 1, 2010 and May 11, 2011, it approved $169,217.58 in charges made on Matrix's BlueTarp credit account at Contract Supply.[7]

On July 28, 2011, BlueTarp filed the present action in this Court seeking to recover those amounts under the terms of the credit line that had been established for Matrix. On August 11, 2011, Matrix filed a suit against BlueTarp, Contract Supply and one other defendant in state court in South Carolina.

### III. DISCUSSION

At this early stage of this case, the parties appear to agree that they have a dispute requiring judicial intervention. They disagree on the proper forum. Plaintiff's filing of the pending complaint evinces a clear desire to have their dispute heard by this Court. However, the pending Motion to Dismiss asserts that this Court lacks personal jurisdiction over Defendant under both the forum selection clause and under recognized limits of personal jurisdiction. In Defendant's view, this case is "a dispute between a Delaware corporation (BlueTarp) and a South Carolina corporation (Matrix) over a contract executed in South Carolina for the purchase of supplies from another South Carolina company (Contract Supply) for construction projects in South Carolina allegedly to be paid in Georgia" and cannot be heard by a federal court sitting in Maine. (Def. Reply (Docket # 13) at 6.)

---

[7] Matrix contends that it paid Contract Supply directly for these purchase orders. Apparently, Matrix made several payments to Contract Supply that Contract Supply then forwarded to the BlueTarp lock box designated for payments. However, BlueTarp was not aware that Matrix was addressing these checks to Contract Supply, because all deposits in the lock box were credited regardless of the payee.

### A. Forum Selection Clause

The credit agreement that serves as the source of the parties' relationship and dispute contains the following language:

> You agree that in the event of default in payment, BlueTarp Financial may institute suit against you in the courts of the State of Maine, regardless of where you are geographically located or conduct business.

(Agreement (Docket # 1-1) at PageID 5.)

Defendant asserts that this forum selection clause in the parties' contract is nothing more than a consent to personal jurisdiction in Maine's state courts and, therefore, that the forum selection clause prohibits this federal Court from exercising jurisdiction over this case. Plaintiff contends that the forum selection clause requires that Defendant be subjected to this Court's jurisdiction because by consenting to jurisdiction in Maine state courts, Defendant consented to jurisdiction in federal district court in Maine.[8]

It is well-settled that contractual forum selection clauses are prima facie valid.[9] See, e.g., M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10 (1977). And because Maine law is coextensive with federal common law concerning the interpretation of forum selection clauses, the Court may apply federal common law to interpret the forum selection clause in this case.[10] See Fairchild Semiconductor Corp. v. Third Dimension (3D) Semiconductor, 589 F. Supp. 2d

---

[8] The contract between the parties includes a choice of law provision, which provides that Maine law shall govern the contract. As neither party disputes the applicability of Maine law, and because there is a reasonable basis for employing Maine law, the Court determines that Maine law governs its analysis of the forum selection clause.

[9] Under Bremen, the forum selection clause controls "absent a strong showing that it should be set aside." 407 U.S. at 15. The party resisting enforcement bears the heavy burden of demonstrating why the clause should not be enforced. Id. at 17. Here, however, neither party contests whether the forum selection clause is enforceable; accordingly, the Court need not evaluate the grounds for finding a forum selection clause unenforceable. See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 632-33 (1985) (discussing the factors).

[10] In addition, because both the First Circuit and Maine courts recognize and enforce forum selection clauses, this Court need not decide the Erie issue of what law applies in deciding the enforceability of the forum selection clause and whether it is procedural or substantive. See Fairchild Semiconductor Corp., 589 F. Supp. 2d at 89 n. 36 (citing Lambert v. Kysar, 983 F.2d 1110 (1st Cir. 1993)).

84, 89 & nn.35, 36 (D. Me. 2008) ("The First Circuit routinely enforces forum selection clauses. The Maine Law Court also recognizes and enforces them."); see also Huhtamaki Co. Mfg. v. CKF, Inc., 648 F. Supp. 2d 167, 180 (D. Me. 2009) (interpreting forum selection clause naming Maine law and Maine courts under federal common law); Genujo Lok Beteiligungs GmbH v. Zorn, 943 A.2d 573, 580 (Me. 2008).

The key question in interpreting the forum selection clause is whether the clause is permissive or mandatory. "Permissive forum selection clauses, often described as 'consent to jurisdiction' clauses, authorize jurisdiction and venue in a designated forum, but do not prohibit litigation elsewhere." Rivera v. Centro Medico De Turabo, Inc., 575 F.3d 10, 17 (1st Cir. 2009) (quoting 14D Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3803.1 (3d ed. 1998)). "In contrast, mandatory forum selection clauses contain clear language indicating that jurisdiction and venue are appropriate exclusively in the designated forum." Id. Defendant argues that the forum selection clause is mandatory – that it was intended to affirmatively confer jurisdiction upon Maine's state courts and limit the jurisdiction of the federal district court in Maine. Plaintiff, on the other hand, does not argue that the forum selection clause is permissive in the classic sense; rather, Plaintiff makes the novel argument that regardless of whether Defendant has established sufficient minimum contacts in Maine, by consenting to suit in Maine state court Defendant consented to suit in federal district court in Maine. Both arguments miss the mark.

The First Circuit instructs that "there is no general rule" for interpreting whether forum selection clauses are mandatory or permissive; rather, the determination depends "on the specific language of the contract at issue." Id. In Autoridad de Energia Electrica de Puerto Rico v. Ericsson Inc., the First Circuit analyzed a forum selection clause with language substantially

8

similar to the language at issue in this case and held that the forum selection clause was permissive. 201 F.3d 15, 18-19 (1st Cir. 2000) (citing similar interpretations of forum selection clauses by the Second, Fifth, and Ninth Circuits). In relevant part, the forum selection clause in Ericsson stated: "the parties agree to submit to the jurisdiction of the courts of the Commonwealth of Puerto Rico," and the Court of Appeals held the clause to be permissive. Id.

In contrast, First Circuit cases holding forum selection clauses to be mandatory note the clauses' stricter language. See, e.g., Rivera, 575 F.3d at 17-18. In Rivera, for example, the First Circuit held that the forum selection clause was mandatory because it required the hospital patient to assert any cause of action he might have against the hospital in the Commonwealth courts of Puerto Rico. Rivera, 575 F.3d at 18. The relevant language stated: "In the event that by act or omission I consider that physical emotional or economic damages have been caused to me, I expressly agree to submit to [Puerto Rico's Commonwealth courts] for any possible claim." Id. at 14. The Court of Appeals in Rivera specifically contrasted the "I expressly agree to submit" language with the lack of such language in the forum selection clause at issue in Ericsson. Rivera, 575 F.3d at 17-18. In Silva v. Encyclopedia Britannica Inc., the Court of Appeals held that the forum selection clause was mandatory because the clause contained language stating that "all actions involving this agreement must be brought in the State of Illinois." 239 F.3d 385, 386, 389 (1st Cir. 2001). The Court of Appeals ruled that inclusion of the word "must" in the forum selection clause "expresses the intention of the parties to make the courts of Illinois the exclusive forum for disputes arising under the contract." Id. at 389; see also LFC Lessors, Inc. v. Pacific Sewer Maint. Corp., 739 F.2d 4, 5-7 (1st Cir. 1984).

Here, the language of the forum selection clause is similar to the language at issue in Ericsson. The relevant language in this case provides that Matrix "agree[s] that in the event of

9

default in payment, BlueTarp Financial may institute suit against you in the courts of the State of Maine….." (Agreement at PageID 5 (emphasis added).) This language stands in contrast to the language in Rivera ("I expressly agree") and Silva ("all actions … must be brought"). Like the language in Ericsson, and perhaps even more so because of the word "may," the forum selection clause in this case indicates an intention of the parties to permit, but not require, jurisdiction in Maine state courts. Accordingly, the Court holds that based on the language of the parties' forum selection clause, BlueTarp is not limited to bringing its action in Maine state court. However, because the parties are not in state court, BlueTarp must show that federal jurisdiction is proper in this case. The Court, therefore, turns to the question of personal jurisdiction.[11]

**B. Personal Jurisdiction**

There are two means of establishing personal jurisdiction over a defendant under the Fourteenth Amendment: general and specific jurisdiction. General personal jurisdiction is established upon a finding that a defendant has maintained "continuous and systematic contacts with a particular state," in which case personal jurisdiction exists as to "all matters, even those unrelated to the forum contacts." Reed & Reed, Inc. v. George R. Cairns & Sons, Inc., 519 F. Supp. 2d 148, 153 (D. Me. 2007) (citing Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999)). Absent general personal jurisdiction, which clearly does not exist in this case, the Court must assess its jurisdiction over Matrix in the context of the specific case and by examining Matrix's case-related contacts with the forum.

---

[11] On the record presented it is not clear to any legal certainty that Bluetarp's claims are in actuality for less than $75,000 as required by 28 U.S.C. 1332(a). In short, the Court believes that Plaintiffs have established a basis for diversity jurisdiction over the subject matter.

To satisfy the requirements of due process for specific jurisdiction over the defendant, the Court must consider "three distinct components."[12] Mass. Sch. of Law, 142 F.3d at 35 (internal citations and quotations omitted). The first, relatedness, asks "whether the defendant's forum-based activities are instrumental in the formation of the contract." Id. The second component looks at whether the defendant has established "minimum contacts" with the forum by purposely availing himself of the benefits of doing business in the forum. See id. Finally, the Court considers the "reasonableness" of the defendant being required to litigate in the forum. Id. The Court considers each component in turn.

**1. Relatedness**

To satisfy "relatedness," BlueTarp's claims must "arise out of" or "relate to" Matrix's purposeful contacts with Maine. In contracts cases, the existence of a contract is not enough. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 478 (1985). "The relatedness requirement is not satisfied merely because a claim arose out of the parties' general relationship. The action must arise out of the specific contacts between the forum and the defendant." See Reed & Reed, 519 F. Supp. 2d at 154 (citing Phillips Exeter Academy v. Howard Phillips Fund, Inc., 196 F.3d 284, 289-90 (1st Cir. 1999). The Court considers any nexus – between the forum state and the formation, performance or breach of the contract – that would give the forum state a legitimate interest in litigation arising out of the alleged breach of contract. See Phillips Exeter Academy, 196 F.3d at 289-90. A prima facie showing of such a nexus requires more than "the mere existence of a contractual relationship between an out-of-state defendant and an in-state

---

[12] The Maine Supreme Court sitting as the Law Court has previously adopted a similar three-part test for considering whether a court's exercise of personal jurisdiction comports with due process. The Law Court specifically requires that (1) Maine have a legitimate interest in the subject matter of the litigation; (2) the defendant, by [its] conduct, reasonably could have anticipated litigation in Maine; and (3) the exercise of jurisdiction by Maine's courts comports with traditional notions of fair play and substantial justice. See Murphy v. Keenan, 667 A.2d 591, 593 (Me. 1995). For purposes of this case, "the difference between the test laid out by the Law Court and the three components laid out by the First Circuit is purely semantic." Telford Aviation, Inc. v Raycom National, Inc., 122 F. Supp. 2d 44, 46 n.3 (D. Me. 2000).

11

plaintiff." See id. at 290 (discussing and citing Burger King Corp., 471 U.S. at 478-79). The action must arise out of the specific contacts between the forum and Defendant. Therefore, the Court must "evaluate the parties' prior negotiations and contemplated future consequences, along with … [their] actual course of dealing" and consider whether "defendant's contacts with the forum were instrumental either in the formation of the contract or in its breach." Reed & Reed, Inc., 519 F. Supp. 2d at 154.

With regard to formation, BlueTarp asserts that Matrix reached into Maine to obtain a contract for the issuance of credit. On the other hand, the uncontradicted facts submitted by Matrix demonstrate that the relevant contract was formed when Matrix signed the commercial credit application in South Carolina in order to facilitate its relationship with Contract Supply, a South Carolina building supply provider. The contract at issue facilitated Matrix's purchase of supplies from the South Carolina supplier for Matrix's construction projects in South Carolina. Defendant's only contact with Maine concerning contract formation occurred when BlueTarp notified Matrix of its incomplete credit application and Matrix returned a completed application to BlueTarp in Maine. Prior to that contact, Matrix and BlueTarp had never communicated. Matrix and BlueTarp engaged in no prior negotiations and discussed no future consequences of the credit agreement.

With regard to the breach of contract, the alleged breach arises from Matrix's failure to pay the balance due on the credit agreement. BlueTarp asserts that this breach occurred in Maine to the extent that amounts due have not been sent to BlueTarp's office in Portland, Maine. Matrix has shown, however, that the BlueTarp invoices sent to Matrix provided that payment should be made to an address in Atlanta, Georgia, not Maine. Accordingly, the location of any alleged breach was Georgia – not Maine. Regardless, "the location where payments are due

under a contract … alone does not possess decretory significance." Phillips Exeter Academy, 196 F.3d at 291. Moreover, while the record reflects that there were several communications between Matrix and BlueTarp during the course of their contractual relationship, the record shows that almost all of those communications were initiated by BlueTarp and focused almost exclusively on collections. There is no evidence to suggest that Matrix purposefully directed communications toward the State of Maine.

Therefore, the Court is left to consider any nexus between the contract and the State of Maine based on Defendant faxing the credit application to Maine, Defendant's alleged failure to deliver payment to an address in Georgia, and communications between Defendant in South Carolina and Plaintiff in Maine. The contacts relating to the execution of the contract and the communications between Matrix and BlueTarp simply do not constitute purposeful acts directed by Matrix to the State of Maine sufficient to establish personal jurisdiction over Matrix. The Court concludes first that these contacts do not create a nexus between Defendant and the forum and second that BlueTarp's cause of action does not arise out of or relate to Matrix's activities in Maine.

### 2. Purposeful Availment

Next, the Court considers whether Matrix's contacts with Maine, described above, constitute purposeful availment of the benefits and protections of Maine law such that Matrix, by its conduct, reasonably could have anticipated litigation in Maine. Nowak v. Tak How Investments, Ltd., 94 F.3d 708, 716 (1st Cir. 1996). This prong of the analysis requires attention to whether Matrix's connection with Maine was voluntary – not that of a third party – and whether Maine-based litigation was foreseeable. Reed & Reed, 519 F. Supp. 2d at 154. The purposeful availment requirement protects defendants from jurisdiction based solely on "random,

fortuitous, or attenuated contacts" or the "unilateral activity of another party." See Telford Aviation, 122 F. Supp. 2d at 47 (quoting Burger King, 471 U.S. at 475).

Thus, the Court must consider whether Matrix's communications with BlueTarp, and the fact that Matrix faxed the corrected commercial credit application to BlueTarp in Maine, constitute purposeful availment. The fact that Matrix's contacts took the form of mail, fax, or email communications rather than physical presence is not determinative. See id. (citing Burger King, 471 U.S. at 476).

Initially, the Court notes that the vast majority of the relevant actions took place in South Carolina. Defendant's construction projects were based in South Carolina and the relevant supplier for this case, Contract Supply, was based in South Carolina. As for the credit agreement, Matrix received the BlueTarp commercial credit application from Contract Supply in South Carolina, and Matrix returned the application to Contract Supply in South Carolina. BlueTarp did not solicit Matrix's business, and the parties did not engage in any negotiations concerning the credit agreement. Matrix only sent the credit application to BlueTarp in Maine because it was required to do so in order to maintain its relationship with Contract Supply. Faxing the credit application to BlueTarp was Matrix's first contact with Maine. The fact that Contract Supply provided Defendant with a credit application from a company in Maine – rather than a company in any other state – was fortuitous. See Telford, 122 F. Supp. 2d at 47 (citing Burger King, 471 U.S. at 475).

The current record further reflects that Matrix and BlueTarp engaged in approximately a dozen communications during an eleven-month period. The majority of those communications, however, were initiated by BlueTarp and concerned collections; less than a handful of the communications were initiated by Matrix. This record of communications does not amount to

the kind of unilateral action that makes Matrix's forum-state contacts voluntary. See Reed & Reed, 519 F. Supp. 2d at 155 (finding communications sufficient to constitute purposeful availment because communications were designed to generate a contractual relationship); see also Autoscribe Corp. v. Goldman and & Steinberg, 47 F.3d 1164, 1995 WL 56662, at *6 (4th Cir. 1995) ("Plaintiff, by its agents' telephone calls, cannot lure the defendants into contact with the forum state for the purpose of establishing personal jurisdiction over them.") (citing Burger King, 471 U.S. 475). Indeed, Matrix made no voluntary decision to inject itself into the local economy as a market participant. See Microfibres, Inc. v. McDevitt-Askew, 20 F. Supp. 2d 316, 321 (D.R.I. 1998) (citing Bond Leather Co., Inc. v. Q.T. Shoe Mfg. Co., Inc., 764 F.2d 928, 933 (1st Cir. 1985)).

Finally, Plaintiff contends that Matrix purposefully availed itself of the benefits and protections of Maine law by entering into a contract that is expressly governed by Maine law. Matrix does not dispute that Maine law applies to this case and concedes that a Maine state court could hear this dispute. As Matrix correctly states, however, a choice of law provision "standing alone, would be insufficient to confer [personal] jurisdiction." See Burger King, 471 U.S. at 482 (stating that a choice of law provision "standing alone would be insufficient to confer jurisdiction," but "when combined with the 20-year interdependent relationship" between defendant and plaintiff the forum selection clause "reinforced … the reasonable possibility of litigation in the forum state"); Calphalon Corp. v. Rowlette, 228 F.3d 718, 723 (6th Cir. 2000) ("The district court also did not err in determining that the choice-of-law provision in the 1997 agreement is not decisive."); NeoDevices, Inc. v. NeoMed, Inc., 2009 WL 689881, at *9 (D.N.H. 2009) (stating that standing alone, a choice-of-law clause is insufficient to confer jurisdiction); Rogers v. 5-Star Management, Inc., 946 F. Supp. 907, 912 (D.N.M. 1996) ("while choice of law

clauses are a factor in deciding whether personal jurisdiction exists, they are generally not determinative"). Accordingly, the Court concludes that in this case the choice of law provision combined with Defendant's tenuous contacts with Maine is insufficient to establish jurisdiction.[13] Indeed, the record now before the Court, construed in the light most favorable to the Plaintiff, does not reflect that Matrix's communications with BlueTarp were such that Maine-based litigation was "certainly foreseeable." See Nowak, 94 F.3d at 717; Phillips Exeter, 196 F.3d at 292.

### 3. Reasonableness

If the contacts question is close, the reasonableness factors "may tip the constitutional balance."[14] Nowak, 94 F.3d at 717. Certainly, the forum state has an interest in adjudicating this dispute, as the Agreement calls for BlueTarp's claims to be litigated according to Maine law. However, the parties' Agreement does not expressly contemplate this Court as a forum, and Matrix does not have the necessary minimum contacts with Maine to demonstrate the required nexus for specific personal jurisdiction. Considering all the facts surrounding the formation and performance of this contract and the limited nature of Defendant's contacts with Maine, the Court concludes that the assertion of specific personal jurisdiction over Defendant would not

---

[13] Although the parties do not raise the issue, the Court considers whether the forum selection clause is a factor in the purposeful availment analysis. On one hand, the fact that Defendant agreed to subject itself to litigation in Maine state courts is at least some indication that Defendant purposefully availed itself of benefits from the forum state. Moreover, it is somewhat incongruous that the state court can exercise personal jurisdiction over this case but the federal court – located just across the street – cannot. On the other hand, the parties expressly agreed to subject themselves to jurisdiction in Maine state courts but not in Maine federal courts. They could have contractually agreed to jurisdiction in both state and federal courts in Maine, but they chose otherwise. For the purposes of personal jurisdiction analysis, it is important to note that although the forum selection clause is at least some indication that Defendant purposefully availed itself of the benefits of the forum state, "a contract alone is not enough; prior dealings, the terms of the contract itself, and the actual and contemplated course of dealings of the parties are necessary elements…." See Microfibres, 20 F. Supp. 2d at 321.

[14] The reasonableness factors are: (a) the defendant's burden of appearing; (b) the forum state's interest in adjudicating the dispute; (c) the plaintiff's interest in obtaining convenient and effective relief; (d) the judicial system's interest in obtaining the most effective resolution of the controversy; and (e) the common interests of all sovereigns in promoting substantive social policies. Nowak, 94 F.3d at 717.

comport with "fair play and substantial justice." See Burger King, 471 U.S. at 486 (internal citation omitted). Therefore, it is unreasonable to require Defendant to defend Plaintiff's claims of breach of contract and unjust enrichment/equitable indemnity here, in Maine.[15] Nonetheless, it is clear there are multiple forums in which Plaintiff may press its claims against Defendant. These forums would appear to include Maine's own state courts.

## IV. CONCLUSION

For the foregoing reasons, the Court ORDERS that Defendant's Motion to Dismiss (Docket # 7) is hereby GRANTED and this case is hereby DISMISSED for lack of personal jurisdiction.[16]

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 22nd day of February, 2012.

---

[15] Because the Court lacks personal jurisdiction over this case, it does not reach Defendant's alternative argument regarding the doctrine of forum non conveniens.

[16] Pursuant to D. Me. Local Rule 7(f), the Court also exercises its discretion to DENY Defendant's request for oral argument to address the factual disputes alleged by Plaintiff.